# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONGREGATION YESHEOS YAKOV, *et al.*, | Docket No. 7:20-cv-08580 |
| *Plaintiffs*, | |
| *v.* | |
| THE STATE OF NEW YORK *and* ANDREW CUOMO, *in his official capacity as Governor of New York State*, | **AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| *Defendants*. | |

Plaintiffs Congregation Yesheos Yakov, by and through Rabbi Moshe Rosner and Congregation Netzach Yisroel, by and through Rabbi Chaim Leibish Rottenberg, through their undersigned attorneys of record, Dhillon Law Group, Inc., as and for their claims against defendants the State of New York, and Andrew M. Cuomo, in his official capacity as the Governor of New York ("Governor Cuomo") allege and complain as follows:

## NATURE OF THE ACTION

1.     On October 6, 2020, Governor Cuomo issued a targeted executive order intended to restrict the rights and activities of specific minority religious communities during one of the most important religious holidays in their faith, designating various areas of cherry-picked locations in State of New York as "red," "orange" or "yellow" zones and imposing new, draconian restrictions on public gatherings – including constitutionally-protected congregate worship – depending on which zone a facility falls in.

2.      The Governor freely and repeatedly admitted his decision was not driven by science, or data, but, by "fear."[1]

3.      In a subsequent filing in another challenge to this order, *Roman Catholic Diocese of Brooklyn, New York v. Cuomo*, 1:20-cv-04844-NGG-CLP (E.D.N.Y.), the New York State Health Commissioner Howard Zucker admitted  as follows:

> There is no specific percentage or threshold to determine when an area should be designated as an Orange or Yellow Zone, as it is a nuanced process that takes multiple factors into account and not solely the positivity percentage.[2]

4.      Based on the fear acknowledged by Governor Cuomo as well as a vague, "nuanced" process, Governor Cuomo's Executive Order No. 202.68 ("E.O. 202.68" or "the Order") established color-coded COVID-19 "hot-spot" zoning areas subject to gathering limits and restriction which singled out as "hot-spots" known enclaves of the Hasidic and strictly-observant Jewish Orthodox communities.

5.      Governor Cuomo justified the creation of these religious-observance-based zones by repeating a false claim that a new "cluster" of COVID-19 positive tests was emerging as "a predominantly ultra-orthodox cluster."[3]

6.      The Order was to be enforced "no later than October 9, 2020," the date of the sacred Jewish holy day of Hoshana Rabbah, which is followed immediately in the Jewish calendar by the festival days of Shemini Atzeres, and Simchas Torah.

---

[1] *See*, "Exclusive Full Recording: Jewish Leaders Say They Were 'Stabbed in the Back' by Cuomo, *HaModia* online, October 12, 2020, available as of the date of filing at https://hamodia.com/2020/10/12/exclusive-recording-jewish-leaders-say-stabbed-back-cuomo/ (Governor Cuomo: "I'm one-hundred percent frank and candid…this is a fear driven response").

[2] See, Declaration of Howard A. Zucker, ECF Doc. 29-1, October, 16, 2020 in Case 1:20-cv-04844-NGG-CLP (E.D.N.Y.).

[3] *See*, *New York Post* online, "Cuomo calls COVID-19 resurgence an 'ultra-Orthodox' Jewish problem," October 9, 2020, available as of the date of filing at https://nypost.com/2020/10/09/gov-cuomo-ny-covid-19-spike-an-ultra-orthodox-jewish-problem/.

7.      E.O. 202.68 created special and particularly draconian "House of Worship" restrictions, limiting attendance at houses of worship to ten people in red zones, and twenty-five people in orange zones, regardless of facility occupancy limits.

8.      Plaintiffs are prominent representatives of the targeted Jewish minority communities, which have been unfairly singled out by this fear-driven executive order due to numerous recent false and discriminatory statements directed at these communities by Governor Cuomo. Governor Cuomo went so far in his conversations with the orthodox community as to threaten, that if these communities did not "agree" to follow the Order, he would "close down [their] religious institutions."

9.      The use of religious observance as an admitted proxy for policies purporting to be based on controlling the spread of COVID-19 presents both facial and as-applied challenges to E.O. 202.68 and the series of prior Executive Emergency Orders issued by Governor Cuomo beginning on March 7, 2020 ("Orders"), as further discussed below.

10.      Defendants' actions, including *inter alia*, the implementation of gathering limits wholly divorced from science based determinations following the Center for Disease Control's (CDC) social distancing guidelines, and related restrictions deeming the constitutionally-privileged conduct of congregate worship as "non-essential," depriving plaintiffs and all other residents of New York City of fundamental rights protected by the constitutions of the United States and the State of New York and New York law and Administrative Code, including the freedoms of religion, speech, and assembly, as well as due process and equal protection under the law.

11.      Moreover, the Governor has already admitted the Order is not rationally-related or narrowly-tailored to the goal of stopping the spread of COIVD-19.  Specifically, Governor Cuomo

has admitted the Order was not a "highly nuanced, sophisticated response," but instead a "fear-driven response." He has admitted the policy was not being "written by a scalpel," but "being cut by a hatchet," and was "not the best way to do it." The Governor suggested that, at a later date when "anxiety" had lessened, he would try to design a "smarter, more tailored approach" that did not target minority faiths.[4]

12.     Despite repeated entreaties for the Governor to rescind and rethink his Order singling out particular religious' communities and Houses of Worship for discriminatory treatment, the Governor has not relented. Plaintiffs are now forced bring this action beseeching this Court to intervene to protect their most sacred rights from this religiously-motivated, fear-driven, irrational Order.

## JURISDICTION AND VENUE

13.     This action arises under 42 U.S.C. § 1983 in relation to defendants' deprivation of plaintiffs' constitutional rights to freedom of religion, speech, and assembly, due process, and equal protection rights under the First and Fourteenth Amendments to the U.S. Constitution.

14.     This action arises under 42 U.S.C. § 1983 in relation to defendants' deprivation of plaintiff's constitutional rights to freedom of religion, speech, and assembly, due process, and equal protection rights under the First and Fourteenth Amendments to the U.S. Constitution. Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief and damages under 28 U.S.C. § 1343(a); and attorneys' fees and costs under 42 U.S.C. § 1988.

---

[4] *See*, fn. 1.

15.     The Court also has supplemental jurisdiction over the related state law claims set forth herein.

16.     The Southern District of New York is the appropriate venue for this action pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because it is the District in which plaintiffs are located and it is the District in which substantially all of the events giving rise to the claims occurred.

## **PARTIES**

17.     Plaintiff Congregation Yesheos Yakov, by and through Rabbi Moshe Rosner, ("Yesheos Yakov" or "Rabbi Rosner") is an orthodox Jewish synagogue located at 15 Cedar Lane, Monsey, NY 10952, and within the "red zone" created by E.O. 202.68.

18.      Plaintiff Congregation Oholei Shem D'Nitra, by and through Rabbi Samuel Teitelbaum, ("Nitra" or "Rabbi Teitelbaum") is an orthodox Jewish synagogue located at 50 Commerce Street, Spring Valley, NY 10977, and within the "red zone" created by E.O. 202.68.

19.     Plaintiff Congregation Nitzach Yisroel, by and through Rabbi Chaim Leibish Rottenberg ("Netzach Yisroel" or "Rabbi Rottenberg") is an orthodox Jewish synagogue located at 49 Forshay Road, Monsey, NY 10952, and within the "yellow zone" created by E.O. 202.68.

20.     Defendant State of New York is sued by and through Andrew M. Cuomo, in his official capacity as Governor of the State of New York.

21.     Defendant Andrew M. Cuomo is sued in his official capacity as Governor of the State of New York.

22.     Each and every defendant has acted under color of state law with respect to all acts or omissions herein alleged.

## FACTUAL ALLEGATIONS

### I.   THE CORONAVIRUS EMERGENCY AND RELATED EXECUTIVE ORDERS

23.     On or about March 13, 2020, President Donald J. Trump proclaimed a National State of Emergency as a result of the threat of the emergence of a novel coronavirus, COVID-19.

24.     This national declaration followed the March 7, 2020 New York State Executive Order 202, by which New York's Governor Andrew Cuomo declared a state disaster emergency to begin emergency response to contain the spread of the virus in this state, which has been the hardest hit.

25.     On March 10, 2020, Governor Cuomo announced new protocols in place for the growing cluster in New Rochelle in Westchester County under the advisement of the state's Department of Health, which included closing schools, houses of worship and other large gathering facilities specifically within a one-mile radius in New Rochelle and for a limited time period.

26.     On March 12, New York's governor limited mass gatherings, directing events with 500 or more individuals in attendance to be cancelled or postponed and requiring that any events, gatherings, or places of business with fewer than 500 individuals in attendance be required to cut capacity by 50 percent.

27.     On March 19, 2020, the Governor signed additional executive orders mandating a decrease in in-office workforce by 75 percent, but excepting "essential service industries," defined as shipping, media, warehousing, grocery and food production, pharmacies, healthcare providers, utilities, banks and related financial institutions, and other industries deemed critical to the supply chain.

28.     On March 20, 2020, Governor Cuomo signed an executive order deemed the "New Yok State on PAUSE Executive Order" ("PAUSE Order") requiring that all "non-essential

businesses" statewide be closed effective 8 p.m. on Sunday, March 22, 2020; requiring that all "non-essential" gatherings of individuals of any size for any reason be canceled or postponed; mandating that any concentration of individuals outside their home be limited to workers providing essential services and mandating social distancing.

29.    The March 20, 2020, order stated that, when in public, individuals must practice social distancing of at least six feet from others, and that businesses and entities that provide essential services implement rules that facilitate social distancing of at least six feet.

30.    That same date, the Governor published, on his office's official website, "Guidance on Essential Services Under The 'New York State on PAUSE' Executive Order" (the "State Guidance") which stated, "Houses of worship are not ordered closed however it is strongly recommended no congregate services be held and social distance maintained." Worship services of more than 50 or more participants, however, were banned.[5]

31.    On March 23, 2020, Governor Cuomo issued Executive Order 202.10, which prohibited all non-essential gatherings of any size for any non-essential business. The guidance on "essential businesses" did not include houses of worship as "essential business."[6]

32.    On April 26, 2020, Governor Cuomo announced a phased approach to reopen industries and businesses in New York on a county by county basis.[7]

33.    On May 21, 2020, Governor Cuomo issued Executive Order No. 202.32, which lifted the ban on non-essential gatherings but put a cap of ten (10) people on such gatherings.

---

[5] State Guidance available as of the date of filing at https://www.governor.ny.gov/news/governor-cuomo-issues-guidance-essential-services-under-new-york-state-pause-executive-order.
[6] *See* guidance available as of the date of filing at https://www.governor.ny.gov/news/governor-cuomo-issues-guidance-essential-services-under-new-york-state-pause-executive-order.
[7] *See* announcement available as of the date of filing at https://www.governor.ny.gov/news/amid-ongoing-covid-19-pandemic-governor-cuomo-outlines-phased-plan-re-open-new-york-starting.

34.     On June 6, 2020, Governor Cuomo issued Executive Order No. 202.38, which altered the ten-person cap on non-essential gatherings to allow houses of worship in Phase 2 to allow twenty-five percent (25%) occupancy.

35.     For others, Guidance for "Phase Two Industries" limited indoor capacity to no more than fifty percent (50%) of maximum capacity.[8]

36.     On June 15, 2020, Governor Cuomo issued Executive Order 202.42, which modified the cap of ten (10) people on any non-essential gathering to allow twenty-five (25) or fewer individuals, for any lawful purpose or reason, provided that the location of the gathering is in a region that has reached Phase 3 of the State's reopening.

37.     On June 24, 2020, Governor Cuomo announced that the twenty-five percent (25%) occupancy cap on houses of worship would be lifted to (thirty-three percent) 33% for regions that qualified for Phase IV of New York State's Reopening Plan.[9]

38.     On June 26, 2020, a federal judge granted an injunction against Governor Cuomo's arbitrary treatment of houses of worship when compared to other non-essential businesses (e.g., restricting the former to, at most, thirty-three percent (33%) while allowing up to fifty percent (50%) for the latter.) (*See*, *Rev. Steven Soos et al. v. Andrew M. Cuomo et al.*, 1:20-cv-651 (GLS/DJS) (N.D.N.Y. June 26, 2020) (ECF No. 35) (the "*Soos* Injunction"). The *Soos* Injunction effectively raised the cap on houses of worship in regions higher than Phase 1 to fifty percent (50%).

---

[8] *See*, e.g., Reopening New York: Essential and Phase II Retail Business Guidelines for Employers and Employees, available as of the date of filing at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/GeneralRetailSummaryGuidance.pdf.

[9] *See* announcement available as of the date of filing at https://www.governor.ny.gov/news/governor-cuomo-announces-five-regions-track-enter-phase-iv-reopening-friday.

## II:      THE *SOOS* INJUNCTION

39.      The Northern District of New York issued the *Soos* Injunction following Governor Cuomo's endorsement of mass demonstrations involving tens of thousands, packed into small spaces, while outdoor gatherings, including graduations, funerals, were prohibited "non-essential gatherings."

40.      The *Soos* Injunction further enjoined Governor Cuomo from restricting indoor religious gatherings to 25% of building capacity and mandated that he and other State of New York employees afford indoor religious gatherings the same capacity limitations afforded to "Phase Two industries," which was – at a minimum – 50%. Some industries in Phase Two were permitted to resume opening at 100% capacity, with no numerical cap.

41.      As of the date of this filing, the State of New York was supposed to be in "Phase Four" of the New York Forward Plan ("NYFP"), which of course, permitted certain *ad hoc* adjustments to be made at Governor Cuomo's unfettered discretion—e.g., no indoor dining in New York City despite its allowance elsewhere in Phase Four.

42.      Yet not even under Phase Four has Governor Cuomo permitted a full restoration of plaintiffs' constitutional rights and the rights of other New York residents. It has been more than 200 days since the coronavirus entered New York, yet religious services are still uniquely confined to 33% of indoor capacity—despite the *Soos* Injunction prohibiting limitations beyond a minimum of 50% capacity.

## III:     E.O. 202.68 — A "FEAR-DRIVEN RESPONSE"

43.      On October 6, 2020, Governor Cuomo signed Executive Order 202.68.[10]

---

[10] Available as of the date of filing the Complaint at https://www.governor.ny.gov/news/no-20268-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency.

44.     E.O. 202.68 establishes various color-coded COVID-19 "hot-spot" zoning areas that are subject to gathering limits and restrictions, establishing, in frank disregard of the *Soos* Injunction and other applicable law, a specific "House of Worship" category that expressly singles out religious places of worship and arbitrarily limits the number of attendees permitted.

45.     As a result of this Executive Order, six hot spots were created in the state of New York. Two of these hot spots are in Queens, one in Brooklyn, one in Orange County, one in Broome County, and one in Rockland County.[11]

46.     If a House of Worship is located within the Red Zone of a Cluster, they are limited to 25% of maximum capacity of the building or 10 people, whichever is less.[12]

47.     If a House of Worship is located within the Yellow Zone of a Cluster, they are limited to 50% of maximum capacity of the building.[13]

48.     The restrictions placed on Houses of Worship are even more stringent than those placed on so-called "essential businesses" and other categories.

49.     The Rockland County Red Cluster Zone is approximately 7 square miles.

---

[11] Available as of the date of filing the Complaint at https://forward.ny.gov/.
[12] Available as of the date of filing the Complaint at https://forward.ny.gov/cluster-action-initiative.
[13] *Id.*



50.     Within the Rockland County Red Cluster Zone, there are 133 synagogues, 20 yeshivas, and 14 Jewish day schools.

51.     All plaintiffs in this lawsuit are in the Rockland County Cluster Zone.

52.     Governor Cuomo admitted to Jewish leaders that the coronavirus-related studies overwhelmingly show that E.O. 202.68 was not promulgated based on scientific evidence or health-based policy. Governor Cuomo stated that "…this is a fear driven response".

53.     Rockland County has a population of 325,789 people.[14]

54.     Rockland County official Dashboard reports that as of the date of the Complaint in this matter, there were only 26 people in the entire county being hospitalized for COVID-19.[15]

---

[14] U.S. Census, available as of the date of filing the Complaint at https://www.census.gov/quickfacts/fact/table/ rocklandcountynewyork/ PST045219.

[15] Available as of the date of filing of the Complaint at https://www.arcgis.com/apps/opsdashboard/index.html#/ d074e0336e81449393a76d1768ceb096.

55.     Daily deaths attributed to COVID-19 have continued to decline since mid-April and have reached statistical zero in New York.



***Source:*** https://ycharts.com/indicators/new_york_coronavirus_deaths_per_day

56.     On October 11, 2020, deaths attributed to COVID-19 fell to just five (5) out of a population of 19,000,000 people (0.00000026% of the population).

57.     The data conclusively demonstrates there is no rational basis upon which Governor Cuomo can continue to rely to perpetuate this state of "disaster emergency" – let alone suspend the fundamental rights guaranteed to plaintiffs and other New York residents in the process.

58.     The effect of E.O. 202.68 is blatantly anti-Semitic, creating religious-observance based color coded "hot-spot" zones directed towards particular Jewish communities.

59.     E.O. 202.68 not only flagrantly flies directly in the face of scientific evidence and the *Soos* Injunction, it specifically singles out the orthodox Jewish community in what has proven to be the latest extension of Governor Cuomo's streak of anti- discrimination against orthodox Jewish communities, to which he has as much as admitted, stating  on October 5, 2020:

I have to say to the Orthodox community tomorrow, if you're not willing to live with these rules, then I'm going to close the synagogues… I'm going to say to the Orthodox community tomorrow, if you don't agree, then we will have to close down your religious institutions.

If the religious leaders do not agree to abide by these rules then we will close the religious institutions, period.

60.     Further proving that the October 6, 2020 Executive Order is not narrowly tailored, Governor Cuomo himself admitted that the restrictions could be "smarter, more tailored." In an October 6, 2020, phone call with Jewish leaders, when asked why restrictions could not be more tailored (such as allowing preschools to remain open as there were no COVID-19 diagnoses), Governor Cuomo stated:

I don't disagree with you, and look, I'm a hundred percent frank and candid. ***This is not a highly nuanced, sophisticated response***, ***this is a fear driven response***, this is not a policy being written by a scalpel, this is a policy being cut by a hatchet, it's just a very blunt, I didn't propose this, you know, it was proposed by the mayor [Blasio] in the city. I'm trying to sharpen it and make it better, but it's out of fear, people see the numbers going up, close everything! ***Close everything! It's not the best way to do it, but it is a fear drive response, the virus scares people, hopefully we get the numbers down in the zip codes, the anxiety comes down, and then we can have a smarter, more tailored approach***, you're point is right, why close every school? Why don't you test the schools and close the ones that have a problem, I know, but, first, I don't know that we have the resources to do that now, but I can tell you honestly, the fear is too high, to do anything other than . . . . Let's do everything we can do to get the infection ate down now, close the doors, close the windows, that's where we are, uh [Health] commissioner do you want add something?

In New York City, ***we have a real problem with fear and anxiety***, and people losing confidence in the city, who's moving out, who's afraid . . . it is a blunt policy, I agree with you, but at this point I don't think we can do anything more sophisticated. Hopefully we get it under control in a few weeks, people take a deep breath, and then ***we can have a more intelligent, sophisticated policy***. [16]

61.     The Governor followed through on his word and issued E.O. 202.68, closing the synagogues effective October 9, 2020— the date of the sacred Jewish holy day of Hoshana

---

[16] *See*, fn. 1

Rabbah, which is immediately followed by the festival days of Shemini Atzeres, and Simchas Torah (the "Hoshana Rabbah Edicts").

62.     As set forth above, in *Roman Catholic Diocese of Brooklyn, New York v. Cuomo*, 1:20-cv-04844-NGG-CLP (E.D.N.Y.), New York's Health Commissioner Howard Zucker at once contradicted the admission by Governor Cuomo that "This is not a highly nuanced, sophisticated response, this is a fear driven response, this is not a policy being written by a scalpel, this is a policy being cut by a hatchet, it's just a very blunt" by stating, under oath, that, while there "is no specific percentage or threshold to determine when an area should be designated as an Orange or Yellow Zones," all the same "it is a nuanced process that takes multiple factors into account and solely the positivity percentage."

63.     As to red zones, in his filing, Zucker stated as follows:

The Red Zone is created by pulling data form ECLRS and analyzing it to map out cases as dots. It is the concentration of dots that indicate a high level of virus in an area which in turn delineates the boundaries of the red zone. When we are mapping the positive cases and creating the zones, we are not looking at the businesses or entities located within those zones, only the number and grouping of positive cases. We look solely at the data and do not take into account who or what are located in that zone - whether it is a non-essential business, school, yeshiva, church, synagogue, or a car dealership - as they all face restrictions, if justified by the scientific data, whether or not that particular school, car dealership, or religious group has positive cases within it. The data drives the zone.

64.     This rationalization of the gerrymander-like shape of the red districts imposed under the Hoshana Rabbah Edicts is internally contradictory and incoherent, besides standing in direct opposition to the Governor's admission that the policy is "not at all highly nuanced [or] sophisticated" but rather one "being cut by a hatchet, it's just a very blunt . . . it's out of fear, people see the numbers going up, close everything! Close everything! It's not the best way to do it, but it is a fear drive response, the virus scares people, hopefully we get the numbers down in the zip codes."

65.     Dr. Zucker's statement claims that, "When we are mapping the positive cases and creating the zones, we are not looking at the businesses or entities located within those zones, only the number and grouping of positive cases." But "cases"—again, positive test results, not hospitalizations—are recorded by the residence of person being tested, not the "businesses or entities" located in those zones. Zucker's statements makes no connection between shutting down synagogues and schools in red zones and the residences of the people visiting, utilizing or attending those institutions.

66.     Furthermore, as shown clearly in the zone maps, zones were simply delineated in many areas based on major roads, resulting, for example, in the isolation of the villages of Ramapo and Spring Valley.  It is implausible that the incidence of positive cases follows the contours of county roads.

67.     Above all, however, Zucker's argument is that it is legitimate to shut down businesses and, more importantly, to infringe on First Amendment rights in what are explained away as just a few neighborhoods – despite the fact that in the entire Rockland County, fewer than 30 people are currently hospitalized hospital because of Covid-19.

68.     Zucker's submission obscures the fact that Covid-19 is simply not a serious health threat. Regardless of how the State draws the lines, the restrictions being imposed have no relationship to an emergency as defined by medical conditions or outcomes resulting from the virus, much less justified under the law.

*69.*     In fact, there is no epidemiological basis, much less a legal one, for shutting down a neighborhood because it has more cases of the flu then another neighborhood in the same county. When Governor Cuomo described this policy as one being shaped, not by a scalpel, but a hatchet,

he was being generous.  It is shaped by a bludgeon and it is aimed at plaintiffs' constitutional rights.

*70.*     Meanwhile, to date nearly 9,000 medical and public health scientists, and over 22,000 medical practitioners, have signed the Great Barrington Declaration, authored by three epidemiologists from Harvard, Oxford, and Stanford universities, stating that continuation of such lockdown "will cause irreparable damage." Defendant has refused whatsoever to reckon with this increasingly prominent point of view among many of those best equipped to assert it.

## IV.     PLAINTIFFS' BACKGROUND & THE HOSHANA RABBAH EDICTS

71.     Congregation Yesheos Yakov is located in a multi-story house of worship with a rabbi's residence at 15 Cedar Lane in Monsey, having a capacity of at least 70 and is host to approximately 50 worshippers on a typical Sabbath or festival.  Rabbi Rosner leads a congregation popularly known as "Tertzal," named for the Hungarian town of Tarcal, of whom the vast majority were murdered during the Holocaust. Rabbi Rosner is a descendant of Yehoshua Heshil Rosner, who perished in the Holocaust in 1944.

72.     Congregation Netzach Yisroel was the site of a vicious anti-Semitic attack by an African American man obsessed with Jewish influence and anti-Semitic propaganda in December of 2019. The community that was the target of the murderous attack on Rabbi Rottenberg's home and synagogue has flourished under his dedicated leadership, and survived that horrific night by not only welcoming the Governor the next day when he called to offer consolation and support, but by continuing with its planned dedication of new Torah scrolls despite the tragedy.  The community's commitment to not being stopped, intimidated or scared is, in the view of its members and its leadership, the key to its success and to Rabbi Rottenberg's unique appeal and the respect both domestically and internationally.

73.     As set forth above, Governor Cuomo promulgated E.O. 202.68 "to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof…" in response to the state of emergency he declared in March to be enforced "no later than October 9, 2020."

74.     As set forth above, Governor Cuomo has made numerous public statements that are negative, false, and discriminatory concerning the Jewish Orthodox community, one of which was his claim on October 6, 2020, that "The cluster is a predominantly ultra-orthodox cluster."

75.     Governor Cuomo has also said "the orthodox community tomorrow if you don't agree then we will have to close down your religious institutions."

76.     Governor Cuomo's restrictions have caused considerable pain and frustration to all observant Jews, given their timing as well as the Governor's express vitriol aimed at them as a religious and ethnic group, but particularly to Rabbi Rottenberg in light of his own history, both distant and recent.

77.     As Professor Josh Blackman wrote in a recent article describing this phenomenon, "During the press conference, [Cuomo] made repeated references to the Jewish community. As Cuomo would tell it, he is a Jew's best friend, but is benevolently restricting their rights to promote the greater good. Stop me if you've heard this one before. . . . Governor Cuomo demonstrated a hostility to Jews, without even recognizing it. Regrettably, he played on old, deeply rooted, and painful anti-Semitic trope: that Jews spread diseases."

78.     As Blackman notes, "Drawing borders around Jewish communities harkens back to a very evil practice during the Third Reich, and much earlier. Indeed, look at this map of Rockland County, New York. There is only a red zone, and a yellow zone. No "buffer" orange zone between the red and yellow. Cuomo must think that Jews will only stay in their red ghetto,

and not dare travel across the street to Costco. And that non-Jews would not dare venture into the red zone to get a knish. Maybe warning signs would help."

79.     "Cuomo played on yet another trope," continues Blackman. "[T]hat Jews are controlled by their rabbis. This cabalistic (cf. Kabbalistic) vision of Judaism plays into the image of the Elders of Zion–that there are several powerful Jews sitting around a table, pulling the strings. If only Cuomo talks to the right Rabbis, everything will be fine. The peons will fall into line."

80.     In his October 8, 2020 letter to Governor Cuomo, however, Rabbi Rottenberg wrote as follows:

> We are pained to remind Your Honor of the visit you made to Rabbi Rottenberg's home less than a day after, in that very place, a machete-wielding man slashed five congregants attending a Hanukkah celebration on December 28th of last year.
>
> Governor Cuomo, Rabbi Rottenberg's pain concerning your actions cannot adequately be stated. Nor can his disappointment concerning the failure here to recognize that what the State deems "non-essential" is, for him and other religious faithful, not only an essential thing. It is the only thing, to which all other considerations short of literal threats to human life, which cannot be said to be at stake here, come far behind.
>
> As you know, following the Hannukah attack, Congregation Netzach Yisroel continued with its planned post-Sabbath "Melave Malkah" celebration for the same night.  To non-members of the community, this commitment and strength was a wonder; to Hasidim and others familiar with and who share the values of this community, it was no less heroic for being entirely characteristic. It is the community—the *kehillah*—that felt the pain of the tragic attack; it was the *kehillah* that came together to show its resolution never to be dissuaded, much less terrorized, from its way; and it is the *kehillah*, sadly, both in Monsey and throughout the region, that feels targeted unfairly by the new regulations planned to go into effect tomorrow.

81.     Plaintiffs received no response to their letter to the Governor.

82.     The original Complaint in this action was filed on October 14, 2020.

## V.   THE OBLIGATION OF COMMUNAL WORSHIP IN JUDAISM

83.    For Jews, communal worship is an essential service for which untold thousands have risked and sacrificed their lives.

84.    Orthodox Jewish men have a strict religious obligation to engage in three daily prayer services on every weekday – one each in the morning, afternoon and night – and four on the Sabbath and most festival days. These prayers were ordained to correspond to the public sacrificial offerings ordained in the Torah and which in ancient times were brought in the Holy Temple in Jerusalem.

85.    The Torah also requires that these regular services, wherever possible and with due respect for countervailing risks of health and safety, be conducted in the presence of a quorum of ten adult men called a minyan, and ideally in a location set aside for prayer such as a synagogue.

86.    It is a principle of normative traditional Judaism that when one prays with a minyan, his or her prayers are more readily accepted by virtue of the merit of collective worship.

87.    Additionally, a synagogue is considered a miniature version of the Holy Temple that stood in Jerusalem because such a facility is set aside and used consistently for collective prayers that parallel the ancient services conducted in the Temple.

88.    Certain key aspects of Jewish religious services can, as a matter of normative traditional Judaism, only be performed in a minyan. These include the recitation of the various kaddish prayers, including the well-known Mourner's Kaddish, the public reading of the Torah on Sabbaths, Mondays and Thursdays, and many other aspects of Jewish traditional worship in which traditional Jews have engaged consistently for thousands of years.

89.      The minyan is so central to traditional Judaism that, in eras of the most extreme and barbaric religious oppression of Jews and Jewish practices, Jews have risked their freedom, property and lives to engage in communal prayer.

90.      The synagogue as a living institution has been critical to the survival of the Jewish people, especially since the destruction of the Temple in Jerusalem.  As historian Paul Johnson writes, after the Destruction in year 70 of the Common Era,

> The rabbi and the synagogue became the normative institutions of Judaism, which from now on was essentially a congregationalist faith. . . . A number of synagogues and tombs from the time of the [Talmudic] sages have survived in Palestine. . . .  At Capernaum, where the centurion whose servant Jesus healed built a synagogue, its second–third-century successor was excavated between 1905 and 1926 . . .

91.      Similarly, historian Will Durant writes, after describing the burning of a synagogue in Orléans, France in the year 560,

> From such tribulations the Jews of the Dispersion always recovered. Patiently they rebuilt their synagogues and the lives . . . Each settlement was required to maintain at communal expense at least one elementary and one secondary school, both of them usually in the synagogue. . . . The faith of their fathers became more precious to the Jews the more it was attacked; and the Talmud and the synagogue were indispensable support and refuge of an oppressed and bewildered people whose life rested on hope, and their hope on faith in their God.

92.      Thus synagogues--living, active, and open synagogues--have always been essential to Jewish life, and no less so than in times of stress and sorrow.  For example, in 2005, according to the Associated Press, a secret 16th-century synagogue, built when Portugal's Jews had been forced to convert to Catholicism or risk being burned at the stake, was hidden behind a false wall in a four-story house in the Portuguese city of Porto.  The *New York Times* reported, in 2015, the discovery of three "strange little" rooms on the same piazza in Venice--16th-century synagogues hidden on the upper floors of crumbling buildings slated for restoration.

93.     In his book *The Holocaust in the Soviet Union*, Yitzhak Arad describes the religious practices of the Jews of Bessarabia and Bukovina, who, packed onto trucks for deportation to death camps, nonetheless formed spontaneous minyan when the trucks would halt in order to pray collectively for an end to the persecution their people were suffering, and continued to do so even in their final destinations until they could do so no more. The United Methodist Church in Trondheim, Norway hid a secret synagogue, at the risk of death to both the hidden and the hiders, during the occupation of Norway in World War II, which was host--during the occupation – to regular communal services and even bar mitzvahs.

94.     Even today, the Associated Press reported in October of last year, observant Jews in Dubai conduct, at considerable risk, a secret synagogue minyan approved by the government but not by anti-Jewish extremists in that Muslim country in order to participate fully in the requisites of traditional Jewish observance.

## VI.   DEFENDANTS' DISCRIMINATORY POLICIES AND CONDUCT

95.     Observant Jews have been at considerable pains, with exceptions that have been few notwithstanding the considerable publicity given to them, as set forth in more detail below, to comply with the emergency restrictions established by the State, including by shuttering hundreds of synagogues and study halls and eliminating communal worship.

96.     Defendants' issuance and enforcement of the Orders has made all but the most minimal communal religious worship in the State of New York unlawful regardless of whether or not such gatherings take place while utilizing even the strictest social distancing guidelines, whether meeting or even exceeding CDC or New York State guidelines in terms of person-to-person special distancing, the use of masks, or any other factor for all other activities.

97.     Defendants' issuance and enforcement of the Orders has essentially made communal religious worship in the State of New York unlawful for women and children, who are not counted toward the count of ten male adults for a prayer quorum or minyan, for an indefinite period of time. As a result, their presence as part of any group of 10 worshippers would result in such a gathering falling short of a minyan.

98.     Defendants' issuance and enforcement of the Orders has made communal religious worship in the State of New York unlawful without reference to epidemiological, statistical or other objective criteria in terms of their enforcement, duration or review and without either a mechanism or a standard for review, appeal, reconsideration or other due process.

## VII.   DEFENDANTS' DISCRIMINATORY ENFORCEMENT OF THE ORDERS

99.     Ultimately, in addition to relegating plaintiff's faith activities to at best second-class status, defendants have threatened plaintiffs with criminal penalties for holding in person services, and have thus substantially burdened their religious exercise by forcing them to choose between their sincerely held religious beliefs and their desire to follow secular rules, in many cases imposed by unelected officials.

100.    As set forth below, the burden on religious practice resulting from defendants' conduct in promulgating and enforcing the Orders is neither neutral nor generally applicable; does not satisfy a compelling governmental interest; is not narrowl- tailored to achieve any such interest that may be found; and constitutes unlawful discrimination under law.

## CLAIMS
### FIRST CLAIM FOR RELIEF

**Violation of the Free Exercise Clause of First Amendment to the
U.S. Constitution
(42 U.S.C. § 1983)**

101.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as
if fully set forth herein.

102.    Plaintiffs' sincerely held religious beliefs require them to participate and gather in
communal worship, celebration, prayer, and teaching.

103.    The Orders, and defendants' enforcement thereof, violate the First Amendment,
both facially and as-applied to plaintiffs. The Orders substantially burden plaintiff's ability to
carry out essential tenants and requirements of their faith, by forbidding them to preside over and
participate in religious gatherings, subject to arbitrary numerical size limitations.

104.    The First Amendment of the Constitution protects the "free exercise" of religion.
Fundamental to this protection is the right to gather and worship. *See W. Va. State Bd. of Educ. v.
Barnette*, 319 U.S. 624, 638 (1943) ("The very purpose of a Bill of Rights was to withdraw
certain subjects from the vicissitudes of political controversy, to place them beyond the reach of
majorities and officials and to establish them as legal principles to be applied by the courts …
[such as the] freedom of worship and assembly."). The Free Exercise Clause applies to the states
through the Due Process Clause of the Fourteenth Amendment. *Cantwell v. Connecticut*, 310
U.S. 296 (1940).

105.    As the Supreme Court has noted, "a law burdening religious practice that is not
neutral or not of general application must undergo the most rigorous of scrutiny." *Church of the
Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993). "A law is not generally
applicable if its prohibitions substantially underinclude non-religiously motivated conduct that

might endanger the same governmental interest that the law is designed to protect." *Id.* at 542–46.

106.    The Orders are neither neutral nor of general application. Defendants' restrictions not only have specifically and explicitly targeted Houses of Worship, but specifically targeted the Jewish orthodox community, and are thus not neutral on their face.

107.    Defendants have decided that Houses of Worship are not essential. Defendants have prohibited various public and private gatherings deemed "non-essential," while exempting a laundry list of industries and services purportedly "essential" to the government's various interests.

108.    Defendants also selectively enforce their Orders, permitting secular gatherings. A recent court decision noted the disparity and hypocrisy. *See Soos. v. Cuomo*, 1:20-cv-651 (GLS/DJS), 2020 WL 3488742 (N.D. N.Y. June 26, 2020).

109.    In addition to relegating all faith activities to a second-class status (at best), defendants have threatened criminal penalties for violating the Orders, and have thus substantially burdened plaintiffs' religious exercise by forcing them to choose between their sincerely held religious beliefs and their desire to follow secular rules, and avoid harsh criminal prosecution and penalty (the fine can be up to fifteen thousand ($15,000.00) *per day*).

110.    Laws and government actions that burden religious practice and are either not neutral or not generally applicable must satisfy a compelling governmental interest and be narrowly tailored to achieve that end.

111.    Defendants' mandates are not "narrowly tailored" to further any compelling governmental interest. Defendants have granted numerous special exemptions to their bans on

public gatherings and conduct, including for purportedly "essential" businesses and activities, provided that social distancing practices are observed.

112.     Requiring plaintiffs to abstain from religious gatherings, despite substantial modifications to satisfy the public health interests at stake, violates plaintiffs' Constitutional right to free exercise of religion.

113.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless defendants are enjoined from further enforcing the Orders.

114.     Pursuant to 42 U.S.C. §§ 1983 and 1988, plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

115.     Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

## SECOND CLAIM FOR RELIEF

### Establishment Clause of First Amendment to U.S. Constitution
### (42 U.S.C. § 1983)

116.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

117.     The Orders and defendants' enforcement thereof violate the First Amendment, both facially and as-applied to plaintiffs. The Establishment Clause of the "First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 860 (2005) (*citing Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). The Establishment Clause applies to the

states through the Due Process Clause of the Fourteenth Amendment. *Everson v. Board of Ed. of Ewing*, 330 U.S. 1 (1947).

118.    Defendants have not and do not act with a clearly secular purpose in adopting and enforcing the Orders – recent statements publicly by defendants are negative, false, and show discriminatory intent.[17]

119.    The Orders and defendants' *ad hoc* enforcement thereof have the primary effect of inhibiting religious activity.

120.    Defendants have failed to avoid excessive government entanglement with religion.

121.    There is no historical precedence in the United States for inhibiting religious practices on terms more restrictive than those imposed on identical secular activities, as defendants do now.

122.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless defendants are enjoined from further enforcing the Orders.

123.    Pursuant to 42 U.S.C. §§ 1983 and 1988, plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

124.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant

---

[17] One of many examples of Governor Cuomo's animus and bias is reflected here: "I have to say to the Orthodox community tomorrow, if you're not willing to live with these rules, then I'm going to close the synagogues… I'm going to say to the Orthodox community tomorrow, if you don't agree, then we will have to close down your religious institutions….If the religious leaders do not agree to abide by these rules then we will close the religious institutions, period." Andrew M. Cuomo, October 5, 2020.

to 42 U.S.C. § 1988.

## THIRD CLAIM FOR RELIEF

### Free Speech Clause of First Amendment to U.S. Constitution
### (42 U.S.C. § 1983)

125.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

126.     The Orders and defendants' enforcement thereof violate the First Amendment, both facially and as-applied to plaintiffs.

127.     Under defendants' Orders, public gatherings and religious services are severely limited, and sometimes prohibited.

128.     Plaintiffs engage in protected speech through worship, religious discussions, singing, and praying.

129.     The Free Speech Clause was incorporated against the states in *Gitlow v. New York*, 268 U.S. 652 (1925) (dicta) and *Stromberg v. California*, 283 U.S. 359 (1931).

130.     Defendants' imposition of the Orders is unreasonable and has a chilling effect on protected speech by placing a severely restrictive numerical cap on Houses of Worship, dependent upon a color-coded zone, under criminal penalty ("any individual who encourages, promotes or organizes a non-essential gathering as set forth in Department of Health regulation, shall be liable for a civil penalty not to exceed $15,000 per day…").

131.     The Orders are unconstitutionally overbroad, and therefore void as a matter of law, both on their faces, and as it is applied.

132.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless defendants are enjoined from further enforcing the Orders.

133.    Pursuant to 42 U.S.C. §§ 1983 and 1988, plaintiffs are entitled to declaratory

relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining

enforcement of the Orders.

134.    Plaintiffs found it necessary to engage the services of private counsel to vindicate

their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant

to 42 U.S.C. § 1988.

## FOURTH CLAIM FOR RELIEF

### Violation of First Amendment Freedom of Assembly Clause
### (42 U.S.C. § 1983)

135.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as

if fully set forth herein.

136.    The Orders and defendants' enforcement thereof violate the First Amendment,

both facially and as-applied to plaintiffs. The First Amendment of the Constitution protects the

"right of the people peaceably to assemble." The Freedom of Assembly Clause was incorporated

against the states in *De Jonge v. Oregon*, 299 U.S. 353 (1937).

137.    "The right of free speech, the right to teach, and the right of assembly are, of

course, fundamental rights." *Whitney v. California*, 274 U.S. 357, 373 (1927). When a

government practice restricts fundamental rights, it is subject to "strict scrutiny" and can be

justified only if it furthers a compelling government purpose and, even then, only if no less

restrictive alternative is available. *See, e.g.*, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S.

1, 16-17 (1973); *Dunn v. Blumstein*, 405 U.S. 330 (1972).

138.    By denying plaintiffs ability to conduct services, even services that comply with

the CDC guidelines for social distancing, defendants are in violation of the Freedom of

Assembly Clause. Defendants cannot meet the no-less-restrictive-alternative test. The CDC's

social distancing guidelines are appropriate to limit the spread of COVID-19. Imposing more restrictive requirements that target Houses of Worship, while at the same time allowing secular gathering in secular businesses and institutions, is not the least restrictive means of achieving defendants' public safety goals. *See DiMartile v. Cuomo*, 1:20-CV-0859 (GTS/CFH), 2020 WL 4558711 (N.D. N.Y August 7, 2020); *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020); *Soos. v. Cuomo*, 1:20-cv-651 (GLS/DJS), 2020 WL 3488742 (N.D. N.Y. June 26, 2020); *First Baptist Church v. Kelly*, No. 20-1102-JWB, 2020 WL 1910021 (D. Kan.  April 18, 2020).

139.    Requiring plaintiffs to abstain from religious gatherings, despite substantial modifications to satisfy the public health interests at stake, violates plaintiffs' Constitutional right to peaceably assemble.

140.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless defendants are enjoined from further enforcing the Orders.

141.    Pursuant to 42 U.S.C. §§ 1983 and 1988, plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

142.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**FIFTH CLAIM FOR RELIEF**

**Combined Violations of Substantive and Procedural Rights in the Due Process Clause of the Fifth and Fourteenth Amendment to U.S. Constitution (42 U.S.C. § 1983)**

143.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

144.     The Orders and defendants' enforcement thereof violate plaintiffs' due process rights secured by the Fifth and Fourteenth Amendment to the U.S. Constitution.

145.     The Fifth Amendment of the U.S. Constitution declares that "[n]o person shall … be deprived of life, liberty, or property without due process of law." The Due Process clause "forbids the government to infringe [on] fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 701, 721 (1997) (internal quotations omitted).

146.     Under the Due Process Clause of the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property, without due process of law." The fundamental liberties protected by this Clause include most of the rights enumerated in the Bill of Rights. *See Duncan v. Louisiana*, 391 U.S. 145, 147–149 (1968). In addition, these liberties extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs. *See, e.g., Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972); *Griswold v. Connecticut*, 381 U.S. 479, 484–486 (1965).

147.     Plaintiffs' rights to freedom of religion, assembly, speech, and travel are fundamental rights protected by the U.S. Constitution. *See, e.g., Aptheker v. Secretary of State*, 378 U.S. 500, 520 (1964); *Kent v. Dulles*, 357 U.S. 116, 127 (1958).

148.     When a government practice restricts fundamental rights such as the right to practice religion freely, assemble peacefully, speak, and travel, it is subject to "strict scrutiny" and can be justified only if it furthers a compelling government purpose, and, even then, only if no less restrictive alternative is available. *See, e.g. Memorial Hospital v. Maricopa County*, 415 U.S. 250, 257-258 (1974); *Dunn v. Blumstein*, 405 U.S. 330, 339-341 (1972); *Shapiro v. Thompson*, 394 U.S. 618, 89 (1969), *Maher v. Roe*, 432 U.S. 464, 488 (1977).

149.     Strict scrutiny applies to plaintiffs' claims because the Orders prohibit plaintiffs from engaging in their constitutionally protected rights. These Orders do not permit plaintiffs to exercise these rights, even while conforming to the CDC guidelines for social distancing, unless defendants deem them "essential" or as participating in "essential" activities. Religious worship is not deemed essential according to the Orders. https://esd.ny.gov/ny-cluster-action-initiative-guidance.

150.     Defendants' mandates are not "narrowly tailored" to further any compelling governmental interest. Defendants allow and have granted numerous special exemptions to secular activities. Since other activities can be permitted, there can be no doubt that defendants may, and therefore must, permit plaintiffs to engage in equivalent constitutionally-protected activities provided that plaintiffs also adhere to the social distancing guidelines.

151.     The Orders and defendants' enforcement thereof violate plaintiff's substantive due process rights as follows:

     a.     Plaintiffs have a right to lawfully pursue religious activities, a substantive due process right impaired by Defendants' actions;

     b.     Defendants lack any legitimate or compelling interest for depriving plaintiffs of their right to engage in their sincerely held religious beliefs, which include meeting in person; and

     c.     Even if such a legitimate, compelling interest existed, the Orders are neither rationally related nor narrowly tailored to further any such interest.

152.     The Orders and defendants' enforcement thereof violate plaintiffs procedural due process rights as follows:

     a.     The Orders provide no process to request redress;

b.      Procedural due process, at a minimum, would permit plaintiffs to meaningfully respond to the Order (or the continuations thereof) and explain how and why the restrictions are unconstitutional as applied to plaintiffs. However, the Orders have prevented plaintiffs from challenging the application of the Orders, denying plaintiffs any process whatsoever before plaintiffs' rights were forcibly taken; and

c.      Further, this taking lasts indefinitely, with the State not providing for any mechanism or opportunity to review or challenge the need to continue restrictions in the light of developing events.

153.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless defendants are enjoined from further enforcing the Orders.

154.    Pursuant to 42 U.S.C. §§ 1983 and 1988, plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

155.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

## SIXTH CLAIM FOR RELIEF

### Violation of the Equal Protection Clause of the
### Fourteenth Amendment to U.S. Constitution
### (42 U.S.C. § 1983)

156.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

157.    The Orders and defendants' enforcement thereof violate the Fourteenth Amendment, both facially and as-applied to plaintiffs. The Fourteenth Amendment of the

Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." Equal protection requires the state to govern impartially—not draw arbitrary distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objection.

158.    The equal protection doctrine prohibits "governmental classifications that affect some groups of citizens differently than others." *Engquist v. Or. Dep't. of Agric.*, 553 U.S. 591, 601 (2008) (citations omitted). The touchstone of this analysis is whether a state creates disparity "between classes of individuals whose situations are arguably indistinguishable." *Ross v. Moffitt*, 417 U.S. 600, 609 (1974). It applies even when the government treats a "class of one" differently. *Willowbrook v. Olech*, 528 U.S. 562, 563 (2000).

159.    While the rational basis test typically applies in this context, any law that "involves a suspect classification, i.e. race, ancestry, and alienage, or … imping[es] upon a fundamental right, i.e. privacy, marriage, voting, travel, and freedom of association" triggers strict scrutiny. *Hoffman v. United States*, 767 F.2d 1431, 1434-35 (9th Cir. 1985) (citations omitted).

160.    Defendants intentionally and arbitrarily categorize individuals and conduct as either "essential" or "non-essential." Those persons classified as "essential," or as participating in essential services, are permitted to go about their business and activities provided certain social distancing practices are employed. Those classified as "non-essential," or as engaging in non-essential activities, are required to stay in their residence, unless it becomes necessary for them to leave for one of the enumerated "essential" activities.[18]

---

[18] Interestingly, recent federal guidance expressly includes Houses of Worship as "essential." Available as of the date of   filing   at   https://www.cisa.gov/sites/default/files/publications/Version_4.0_CISA_Guidance_on_Essential _Critical_Infrastructure_Workers__FINAL%20AUG%2018v3.pdf (see page 19, "Clergy and other essential support for houses of worship").

161.    Strict scrutiny under the Equal Protection Clause applies where, as here, the classification impinges on a fundamental right, including the right to practice religion freely, to right to free speech and assembly, and the right to travel, among others.

162.    Defendants cannot satisfy strict scrutiny, because their arbitrary classifications are not narrowly tailored measures that further compelling government interests, for the reasons stated above.

163.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless defendants are enjoined from further enforcing the Orders.

164.    Pursuant to 42 U.S.C. §§ 1983 and 1988, plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

165.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment against defendants as follows:

A.    An order and judgment declaring that the Orders, facially and as applied to plaintiffs, violate the First, Fifth, and Fourteenth Amendments to the U.S. Constitution and the New York State Constitution;

B.     An order temporarily, preliminarily, and permanently enjoining and prohibiting defendants from enforcing the Hashana Rabbah Decrees or the Executive Orders set forth above or otherwise interfering with plaintiffs' constitutional rights and liberties;

C.     For attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other legal basis for such fees and costs as may apply;

D.     Such other and further relief as the Court deems appropriate and just.

DHILLON LAW GROUP INC.

By: _____

RONALD D. COLEMAN
(SBN: 2288835)

HARMEET K. DHILLON (SBN: 2667350)
rcoleman@dhillonlaw.com
harmeet@dhillonlaw.com
256 5th Ave., Floor 4
New York, New York 10001
Telephone: 347-996-4840
*Attorneys for Plaintiffs*

Dated: October 16, 2020